**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

STARLENA WILKERSON,                                      Case No. 1:12-cv-868

　　　　　Plaintiff,                                     Spiegel, J.
                                                        Bowman, M.J.

　　v.

COMMISSIONER OF SOCIAL SECURITY,

　　　　　Defendant.


**REPORT AND RECOMMENDATION**

　　　　Plaintiff Starlena Wilkerson filed this Social Security appeal in order to challenge the Defendant's finding that she is not disabled.  *See* 42 U.S.C. §405(g).  Proceeding through counsel, Plaintiff presents two claims of error for this Court's review.  As explained below, I conclude that the ALJ's finding of non-disability should be AFFIRMED, because it is supported by substantial evidence in the administrative record.

　　**I.  Summary of Administrative Record**

　　　　Plaintiff filed an application for Disability Insurance Benefits ("DIB") in August 2008, alleging a disability onset date of April 12, 2008 based upon a combination of physical and mental impairments.  Plaintiff's application was denied initially and upon reconsideration, and she timely requested an evidentiary hearing.  In December 2010, Administrative Law Judge ("ALJ") Amelia Lombardo held a hearing at which Plaintiff appeared with counsel, and at which Plaintiff and a vocational expert testified.  ALJ

1

Lombardo issued a decision on March 17, 2011, concluding that Plaintiff was not disabled. (Tr. 13-27). The Appeals Council denied review; therefore, the ALJ's decision remains as the final decision of the Commissioner. Plaintiff filed the instant complaint in order to challenge the ALJ's decision.

Although Plaintiff's claimed disability onset date preceded her fiftieth birthday by three months, by the time Plaintiff filed her DIB application, she had attained that age, placing her in the category of "closely approaching advanced age." She was 52 years old at the time of the ALJ's decision. The ALJ determined she had at least a high school education and past relevant work as a collections clerk, as a store room clerk, and as a secretary. (Tr. 26-27). Most of Plaintiff's past work experience was at Wright Patterson Air Force Base, where she also has received much of her medical care.

The ALJ found that Plaintiff "has the following severe impairments: residual effects of right knee surgery, cervical degenerative disc disease, obesity, and carpal tunnel syndrome." (Tr. 16). However, the ALJ also determined that none of the impairments or combination thereof met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, such that Plaintiff was entitled to a presumption of disability. (Tr. 19). Rather, the ALJ concluded that Plaintiff retained the following residual functional capacity ("RFC") to perform a range of light work, except as further limited by the following:

> She can only occasionally stoop, crouch, kneel, and crawl. She can only occasionally push or pull with the upper extremities, and she can perform bilateral fingering no more than frequently.

(Tr. 20). The ALJ discounted many of Plaintiff's complaints as "not credible." (Tr. 21).

Based upon testimony of a vocational expert, the ALJ found that Plaintiff could perform two prior skilled jobs (collections clerk and secretary), both at the sedentary

exertional level.  (Tr. 27).  Therefore, the ALJ further concluded that Plaintiff is not under a disability.  (Tr. 27).

In her statement of errors, Plaintiff argues that the ALJ erred when she: (1) failed to properly evaluate the opinions of four treating sources; and (2) assigned "great weight" instead to the opinions of a non-treating and a non-examining consultant, but then omitted limitations found by the consulting physician.  Plaintiff does not challenge the ALJ's adverse credibility determination.

## II. Analysis

### A. Judicial Standard of Review

To be eligible for benefits, a claimant must be under a "disability."  *See* 42 U.S.C. §1382c(a).  Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies.  *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

When a court is asked to review the Commissioner's denial of benefits, the court's first inquiry is to determine whether the ALJ's non-disability finding is supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (additional citation and internal quotation omitted).  In conducting this review, the court should consider the record as a whole.  *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978).  If substantial evidence supports the ALJ's denial of benefits, then that finding must be affirmed, even if

3

substantial evidence also exists in the record to support a finding of disability.  *Felisky v.*

*Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).  As the Sixth Circuit has explained:

> The Secretary's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion . . . . The substantial evidence standard presupposes that there is a 'zone of choice' within which the Secretary may proceed without interference from the courts.  If the Secretary's decision is supported by substantial evidence, a reviewing court must affirm.

*Id.*  (citations omitted).

In considering an application for supplemental security income or for disability benefits, the Social Security Agency is guided by the following sequential benefits analysis: at Step 1, the Commissioner asks if the claimant is still performing substantial gainful activity; at Step 2, the Commissioner determines if one or more of the claimant's impairments are "severe;" at Step 3, the Commissioner analyzes whether the claimant's impairments, singly or in combination, meet or equal a Listing in the Listing of Impairments; at Step 4, the Commissioner determines whether or not the claimant can still perform her past relevant work; and finally, at Step 5, if it is established that claimant can no longer perform her past relevant work, the burden of proof shifts to the agency to determine whether a significant number of other jobs which the claimant can perform exist in the national economy.  *See Combs v.  Commissioner of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006); 20 C.F.R. §§404.1520, 416.920.

A plaintiff bears the ultimate burden to prove by sufficient evidence that she is entitled to disability benefits.  20 C.F.R. § 404.1512(a).  A claimant seeking benefits must present sufficient evidence to show that, during the relevant time period, she suffered an impairment, or combination of impairments, expected to last at least twelve months, that left her unable to perform any job.  42 U.S.C. § 423(d)(1)(A).

**B.  Specific Errors**

**1.  Treating Physician Rule**

Plaintiff first argues that the ALJ erred by improperly evaluating the opinions of four different treating physicians:  Drs. Uzpen, Reddy, Wells, and Alkhawaga.

The relevant regulation provides: "If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight." 20 C.F.R.  §404.1527(c)(2); *see also Warner v. Com'r of Soc. Sec.,* 375 F.3d 387, 390 (6th Cir. 2004). The reasoning behind what has become known as "the treating physician rule" has been stated as follows:

> [T]hese sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of the claimant's medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

*Wilson v. Commissioner of Social Security,* 378 F.3d 541, 544 (6th Cir. 2004)(quoting former 20 C.F.R. § 404.1527(d)(2)).  Thus, the treating physician rule requires the ALJ to generally give "greater deference to the opinions of treating physicians than to the opinions of non-treating physicians."  *See Blakley v. Com'r of Social Security*, 581 F.3d 399, 406 (6th Cir. 2009).

Despite the presumptive weight given to the opinions of a treating physician, if those opinions are not "well-supported" or are inconsistent with other substantial evidence, then the opinions need not be given controlling weight.  Soc. Sec. Ruling 96-2p, 1996 WL 374188, at *2 (July 2, 1996).  In such cases, the ALJ should review

5

additional factors to determine how much weight should be afforded to the opinion. These factors include, but are not limited to: "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Blakley*, 581 F.3d at 406; *see also* 20 C.F.R. §404.1527(c)(2). "[A] finding that a treating source medical opinion...is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." *Blakley*, 581 F.3d at 408 (quoting Soc. Sec. Rul. 96-2p).

An ALJ must give "good reasons" for rejecting the opinion of a treating physician. *See* Soc. Sec. Ruling 96-2p, 1996 WL 374188 (July 2, 1996); *see also* 20 C.F.R. §1527(c)(2)("We will always give good reasons…for the weight we give your treating source's opinion."). If an ALJ rejects the opinion of a treating physician without providing "good reasons," this Court will reverse, absent a clear determination that the opinion was so "patently deficient that the Commissioner could not possibly credit it," or that the procedural error was otherwise harmless. *See Wilson v. Com'r of Soc. Sec.*, 378 F.3d at 547. Plaintiff argues that in this case, the ALJ failed to give "good reasons" for rejecting multiple opinions of her treating physicians.

### a.    Dr. Uzpen and Dr. Jacobson

Dr. Joseph Uzpen and Dr. Jon Jacobson were two of Plaintiff's treating physicians at the Wright Patterson Health Clinic. In September, 2008, Dr. Uzpen "noted an abnormal gait, due to difficulty bearing weight on the right knee. A neurological examination was normal, other than the presence of Romberg's signs (Exhibit 5F, pages 9-18)." (Tr. 22).

6

The ALJ described the opinion evidence from these two physicians as follows:

> Dr. Uzpen…opined in several narrative letters dated in 2008 that he "strongly support[ed] the effort to allow her as much off duty time as possible," and he stated this applied from September 26, 2007 through December 11, 2007, December 11, 2007, through March 10, 2008, and March 10, 2008 through June 9, 2008. . ..  In a Return to Duty form dated February 23, 2009, Jon Jacobson, D.O., indicated his opinion that claimant was unable to return to work at that time (Exhibit 10F, pages 15-17).  Dr. Jacobson noted a similar opinion in a ….progress note dated April 2, 2009 (Exhibit 21F, page 22).

(Tr. 25).  After reviewing the relevant regulations, the ALJ determined:

> [T]he opinions of Drs. Uzpen and Jacobson are not entitled to controlling or deferential weight under the Regulations.  The undersigned gives little weight to both assessments, as they are unsupported by objective findings in the preponderance of the record.  It appears that Dr. Uzpen provided these opinions primarily upon the claimant's request, as the record contains a letter from the military stating that the aforementioned statements, with exactly the same dates set forth above, were required for benefits/medical leave (Exhibit 5F, page 52). As for Dr. Jacobson's opinion his assessment is not supported by objective findings or functional limitations.  Moreover, the determination of disability is a question reserved to the Commissioner, and there is no indication that Dr. Jacobson is qualified to offer an opinion on the claimant's employability.

(Tr. 25-26).

Plaintiff first asserts error in the rejection of Dr. Uzpen's opinions.  She criticizes the ALJ's reference to the "preponderance of the record" as "not sufficiently specific to explain the ALJ's reasoning."  However, the ALJ's assessment that the opinions were not supported by "objective findings" in the "preponderance of the record" is consistent with the legal standard that a treating physician's opinion is entitled to controlling weight only if "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record."  20 C.F.R. §1527(c)(2).

It is worth noting that the letters authored by Dr. Uzpen were for the purpose of assisting Plaintiff with her request to become, and to continue being, an "authorized leave recipient" eligible to receive paid leave.  As stated by the ALJ, Dr. Uzpen's letters mirror the language expressly requested by Plaintiff to be included in those letters, so that she could send them to Human Resources.  Other than stating in the three identical letters that he supports Plaintiff's effort to obtain "as much off duty time as possible," Dr. Uzpen's letters do not express any opinion on whether he believed Plaintiff to be functionally incapable of working any job.  Moreover, the identical letters pertain to periods of time that *predate* the period that Plaintiff herself claims to have been disabled:  September 26, 2007 through December 11, 2007, and December 11, 2007 through March 10, 2008.  The third letter also opines on a period of time that begins prior to Plaintiff's alleged disability onset date, on March 10, 2008.  Although the third letter overlaps with Plaintiff's claimed disability period, beginning in April 2008, even that letter opines only on a short period of time after Plaintiff's alleged disability began, and ends on June 9, 2008.[1]

Plaintiff further argues that neither the fact that Dr. Uzpen's opinions mirror those in another exhibit (her own request for the letters to submit to her Human Resources manager), nor the fact that they were drafted at Plaintiff's request, constitute "good reasons" for rejecting Dr. Uzpen's opinions.[2]  However, the Sixth Circuit has never

---

[1] An office note dated September 17, 2008 reflects that Plaintiff sought additional extended leave paperwork and a prescription for an electric wheelchair from Dr. Wells, but was advised that Dr. Wells' office had "no record" of either leave paperwork or a need for a wheelchair prescription.  Further, the note states that Dr. Uzpen (referred to as "PA Uzpen") also had not received any leave paperwork and "will not request WC [wheelchair]." (Tr. 788).

[2] Plaintiff cites no authority suggesting that it was legal error for the ALJ to reference these facts.  In some cases, these facts could be irrelevant but in this instance, the context of Dr. Uzpen's opinions as well as the referenced dates and formulaic nature of the letters undermines their credibility.

required any particular number of sentences or specific analysis to satisfy the "good reasons" standard, so long as the explanation is sufficient for this Court to understand the basis for the ALJ's decision.  Based upon the above analysis and in view of the record as a whole, the undersigned concludes that the ALJ satisfied the legal standard. *Accord Allen v. Com'r of Soc. Sec.*, 561 F.3d 646, 651 (6th Cir. 2009)(affirming after concluding that ALJ's one-sentence rejection of treating physician's opinion satisfied the "good reasons" requirement).  The ALJ's explanation here explains both the lack of supportability of the opinion in context, and the lack of objective findings.

Plaintiff similarly asserts error in the rejection of Dr. Jacobson's opinions, arguing that the ALJ's reasons are neither "good, nor specific" enough for assigning "little weight" to that doctor's opinions.  (Doc. 8 at 14).  Again, however, the undersigned must disagree.  The ALJ explained that Dr. Jacobson's opinions were unsupported by objective findings, and further pointed out that his opinion was not supported by any specific functional limitations.  The undersigned would add only that the "Return to Duty" form consists of a single page and is cursory at best, reflecting a single "not cleared for duty" check box as to whether Plaintiff should or should not be returned to her duty station/job. (Tr. 471, 473). Last but not least, the ALJ correctly pointed out that the opinion of a physician concerning the ultimate issue of disability is not the type of opinion that is ever entitled to controlling weight – even if offered by a treating physician – because that issue is expressly reserved to the Commissioner.  20 C.F.R. 404.1527(d)(1).

### b.    Dr. Reddy

Dr. B.K. Reddy is Plaintiff's pain specialist, with whom she began treating on September 8, 2008 after she left the practice of Drs. Donini and Lichota.  She reported

to Dr. Reddy that she had suffered from "severe" pain in her arms, wrists, hands, and neck for at least twelve years, dating back to the late 1990's.  Dr. Reddy continued to treat Plaintiff every four weeks for ongoing pain management.  (Tr. 459).  At her initial examination, Dr. Reddy found decreased range of motion and pain upon Patrick's testing, but also reported reasonably preserved motion of the cervical spine, only minimal tenderness in the lower back, and negative straight leg raising bilaterally.  (Tr. 22, citing Tr. 437).  And, despite the Plaintiff's report that she was using a walker, Dr. Reddy recorded a normal gait.  (Tr. 22, quoting Tr. 426-438).  The ALJ described Dr. Reddy's prescribed course of treatment and opinions:

> She recommended manual therapy and electrical stimulation.  Dr. Reddy began administering a series of epidural steroid injections at that time.  On November 24, 2008, Dr. Reddy stated that the claimant's pain levels were "somewhat controlled."  On March 21, 2009, Dr. Reddy stated that an axial compression test and Spurling's maneuver were only "questionably positive," but she also reported relatively preserved cervical spine range of motion.  Although the examination showed decreased lumbar spine motions, Dr. Reddy also noted negative straight leg raising.  Treatment notes dated between [sic] and December 2009 generally show only restricted and painful lower back motions.  She noted that the claimant usually presented with a walker between [sic] and November 2008, and the claimant apparently began presenting with a wheelchair in January 2009; however, she noted that the claimant was using only a cane between June 2010 and September 2010, and in July 2010, she stated that the claimant's condition was "stable" (Exhibits 8F, 10F, 15F, 16F, and 24F).

(Tr. 22).

With respect to Plaintiff's complaints of knee pain, when Dr. Reddy examined her post-surgery in September 2008, "she noted only right knee tenderness and stated that the claimant refused to have any knee jerks elicited, due to alleged pain (Exhibit 8F, page 25)."  (Tr. 23, citing Tr. 437).  In March 2009, Dr. Reddy also recorded Plaintiff's

complaints of "pain upon right knee motions" and that there was evidence "only of crepitation." (Tr. 23).

The ALJ noted that Plaintiff "has been noncompliant with treatment recommendations" by Dr. Reddy.  For example:

> On March 21, 2009, Dr. Reddy stated that the claimant had been prescribed physical medicine treatments but had not been compliant with the therapy as recommended (Exhibit 10F, page 5).  The claimant has also continued to smoke throughout the record, against medical advice (see Exhibit 22F, page 13).  The record also shows that, despite this noncompliance, the claimant's medications have been relatively effective in controlling her symptoms.  After significant questioning at the hearing, the claimant eventually admitted that her pain medications help "to a certain point."

(Tr. 23-24).

In contrast to her statements to Dr. Reddy "in March 2009 that she was noncompliant with physical therapy because of her complete inability to drive," Plaintiff told her therapist in May 2009 "that she was concerned about driving from Hamilton to the Wright Patterson Air Force Base." (Tr. 24).  In the same vein, in contrast to her testimony that she could drive for not more than 15 minutes at a time, Plaintiff "stated on August 12, 2010, that she was driving to southern Columbus that evening for a date with a man she had met from her online dating searches, and she stated on September 2, 2010, that she had continued to see the man…." (Tr. 24; *see also* Tr. 803, 807).

After reviewing Dr. Reddy's clinical records, Plaintiff's noncompliance with the physical therapy prescribed by Dr. Reddy, and additional credibility issues concerning Plaintiff's pain complaints, the ALJ finally turned to the specific opinions offered by Dr. Reddy concerning Plaintiff's allegedly disabling level of pain:

> By letter dated March 26, 2009, Dr. Reddy opined that Plaintiff was unable to work "at this time or in the foreseeable future" (Exhibit 10F, page 6).  Dr. Reddy completed a Basic Medical Form for the Ohio Department of Job

and Family Services (ODJF) on August 3, 2009, and she offered her opinion that the claimant could lift and/or carry no more than five pounds at a time, sit no more than one hour at a time or for a total of four to six hours in an eight-hour workday, and stand and/or walk no more than 15 minutes at a time for a total of less than one hour in an eight-hour workday.  Dr. Reddy also opined that the claimant was markedly to extremely limited in the ability to push, pull, bend, reach, handle, and perform repetitive foot movements.  According to Dr. Reddy, the claimant was "unemployable" (Exhibit 16F, pages 1-3).

…[T]he undersigned finds that Dr. Reddy's opinion is not entitled to controlling or deferential weight under the Regulations.  The undersigned gives little weight to her assessment, as it is unsupported by objective findings in the record.  As discussed above, Dr. Reddy's treatment notes primarily reflect only restricted and painful lower back motions with preserved cervical spine range of motion…and the restrictions in the residual functional capacity above adequately account for these findings.  The undersigned also gives little weight to Dr. Reddy's opinion that the claimant is unemployable, as this is a determination reserved for the Commissioner of Social Security.

(Tr. 26).

As with the rejection of Dr. Uzpen's opinions, Plaintiff criticizes the ALJ's explanation of her assessment of Dr. Reddy's opinions as "insufficiently specific."  (Doc. 8 at 12). Additionally, Plaintiff argues that the ALJ "supplants her own analysis of Dr. Reddy's treatment notes," (*see id.*), and in that respect oversteps her role and "play[s] doctor" by substituting her opinion for that of Plaintiff's treating physician.  (Doc. 8 at 13).

As the above quotations illustrate, however, the ALJ's explanation of why she disagreed with Dr. Reddy's opinions was quite specific and detailed.  Dr. Reddy never performed any functional testing or recorded any other objective clinical findings that would have supported the multiple functional limitations as to which Dr. Reddy offered opinions, such as concerning Plaintiff's ability to lift/carry or use her hands. To the contrary, as explained by the ALJ, many of Dr. Reddy's clinical findings were in direct

12

contrast to the functional limitations she espoused.  For example, she found that Plaintiff had a "normal gait" and negative straight leg testing, with only a "questionably" positive Spurling's test; all of which data undermines many of Dr. Reddy's extreme limitations. Dr. Reddy also reported "exaggerated pain behaviors."  (Tr. 461).  And, while Plaintiff continued to report severe pain to her pain doctor, the ALJ noted elsewhere in his opinion the evidence that Plaintiff's pain was at least somewhat controlled by her medication regimen (Tr. 460).  The ALJ also pointed out several occasions on which Plaintiff's reports to Dr. Reddy were contrary to her reports to other physicians. (*See, e.g.*, Tr. 223, 483, 861-862, 864, regarding Plaintiff's attempts to obtain pain medication from multiple physicians, and references to her driving).

The ALJ clearly has satisfied the "good reasons" standard by highlighting the inconsistencies between the objective evidence, the treatment notes, and Dr. Reddy's opinions concerning Plaintiff's functional limitations.  In contrast to Plaintiff's argument, the undersigned does not find that the ALJ "played doctor."  An ALJ is required to evaluate often inconsistent medical evidence in order to arrive at a residual functional capacity that is supported by substantial evidence in the record as a whole.  While an ALJ may overstep that boundary if, for example, she reads an x-ray report and arrives at a conclusion that is not otherwise supported in the record by a medical doctor, the same error does not occur when an ALJ merely points out inconsistencies between non-interpretive objective evidence, a physician's own clinical records, and that physician's disability-related opinions.

### c.    Dr. Britton Wells

On April 21, 2008, Plaintiff sought treatment from Britton Wells, M.D. for knee pain.  An MRI dated May 5, 2008 showed "degenerative changes of the medial and

lateral meniscus with a tear of the posterior horn of the lateral meniscus, as well as chondromalacia of the patella and femoral condyle." (Tr. 16, 22). The same MRI showed minimal to mild osteoarthritis. (*Id.*). On May 21, 2008, Dr. Wells performed arthroscopic surgery, with a partial lateral meniscectomy, on Plaintiff's right knee. (Tr. 16, 22). The ALJ summarized Dr. Wells' records, which referenced osteoarthritis and synovitis, but noted that "the record shows no post-surgical evidence of the conditions." (Tr. 19).

Nevertheless, the ALJ pointed out a post-surgical record dated July 10, 2008 in which Dr. Wells reported his physical examination "showed effusion and limited range of motion," leading to his administration of "the first in a series of Synovisc injections." (Tr. 23). According to Plaintiff's own report, those injections provided "good relief," and she requested additional injections on December 16, 2008. (Tr. 23). "Although the claimant continued to complain of knee pain, Dr. Wells stated on March 19, 2009, that an examination showed normal range of motion, although with pain and tenderness, and otherwise revealed no significant effusion, warmth, or edema (Exhibit 13F, page 1)." (Tr. 23).

The ALJ included the post-surgical condition of Plaintiff's right knee as a "severe" impairment, (Tr. 19), and stated that he was giving "deferential weight" to Dr. Wells' opinion, to the extent that the ALJ restricted Plaintiff to a range of light work that precluded more than "occasionally" being able to "stoop, crouch, kneel, and crawl." (Tr. 26, *see also* Tr. 20).

> In a progress note dated July 10, 2009, Dr. Wells opined that, in the claimant's current condition, she was unable to engage in "prolonged" periods of "standing, walking, etc." (Exhibit 3F, page 4). Dr. Wells provided a similar opinion in a narrative note dated March 19, 2009… The undersigned gives deferential weight to Dr. Well's opinion…, as the

restrictions above to a reduced range of light work adequately account for his assessment. As discussed above, Dr. Wells' treatment notes show relatively normal range of right knee motions with no effusion, warmth, or edema (Exhibit 13F). Any further restrictions than the ones set forth above would not be supported by objective findings in the substantial medical evidence of record.

(Tr. 26). Plaintiff argues that despite according Dr. Wells' opinion "deferential weight," the ALJ failed to incorporate any standing or walking limitations. Dr. Wells specifically opined in March 2009 that Plaintiff's prognosis was "fair" and that she could not engage in "prolonged" periods of "standing, squatting, kneeling, climbing or heavy lifting." (Tr. 457). Months earlier, on July 10, 2008, when Plaintiff was seven weeks post-op from her arthroscopic knee surgery, Dr. Wells similarly opined, "I feel that she is really not able to work for any prolonged periods or standing, walking, etc., at this time." (Tr. 274).

Defendant responds by arguing that the ALJ was not required to adopt Dr. Wells' opinions in their entirety, and that the ALJ reasonably explained why she was not adopting additional restrictions as "not...supported by objective findings in the substantial medical evidence of record." (Tr. 26). In her reply, Plaintiff claims that additional restrictions on standing and/or walking - whether expressed as an option to alternate between sitting and standing, or otherwise - would likely have further eroded the range of light work that Plaintiff could perform. But the ALJ ultimately determined that Plaintiff was capable of performing her past relevant work as a collections agent and secretary, both of which jobs primarily involve sitting. There is no evidence to suggest, and Plaintiff does not even argue, that additional restrictions on standing and/or walking or the addition of a sit/stand option would have eliminated the two past jobs that the ALJ determined she could continue to perform. Therefore, to the extent

that the ALJ committed any error at all by failing to include a restriction on "prolonged" standing or walking, the asserted error was harmless on the record presented.

### d. Dr. Esam Alkhawaga

In March 2008, Plaintiff first sought psychiatric treatment from Esam Alkhawaga, M.D. Dr. Alkhawaga stated that Plaintiff's prognosis was "fair," but expected to improve with treatment. (Tr. 17, citing Exhibit 10F, page 2). Shortly thereafter, in July 2008, Plaintiff began treatment with a Master's level therapist, Jack Adkins. (Tr. 464). The ALJ described the history of Plaintiff's mental health treatment as follows:

> The claimant subsequently began treatment at TCN Behavioral Health on July 23, 2008, notably not until after she filed her application for Social Security benefits. At that time, Jack Adkins, M.S., P.C.C., diagnosed a major depressive disorder, recurrent and moderate, and arrived at a GAF score of 55, which indicates only moderate symptomatology…. However, when psychiatrist Dr. Alkhawaga examined the claimant on April 10, 2008, he arrived at a GAF score of 60. Dr. Alkhawaga indicated that a mental status examination showed only a depressed mood and preoccupation with her health issues. He otherwise noted a full-ranged affect, fair concentration and memory, fair recent and remote memory, fair insight and judgment, fair concentration recall, average intellectual functioning, full orientation, and normal thought processes. He prescribed Cymbalta and Trazodone. (Exhibit 4F, pages 11-15).
>
> Dr. Alkhawaga reported similar, but improved, findings through November 2010. For example, he noted only mild depression and a "stable" overall condition in November 2008, and Dr. Alkhawaga stated that the claimant was only "mildly" depressed and exhibited a full-ranged affect in June 2008, April 2009, and June 2009. On August 19, 2009, he noted only mild anxiousness and stated that the claimant's condition was "stable at baseline," and he began consistently reporting a euthymic mood in May 2010. Moreover, Dr. Alkhawaga apparently told the claimant in March 2009 that her limitations were "mainly physical" and that she did not have any mental or psychiatric limitations that would "make her eligible for disability" (Exhibits 4F, 17F, 23F, and 25F).

(Tr. 17-18, see generally Tr. 298-302). The ALJ reviewed Plaintiff's therapy notes, which reflected "no more than a depressed mood," and which on May 21, 2009 reflected her therapist's impression that she did not appear anxious "at all" even though she

16

claimed otherwise.  (*See also* Tr. 812, 'presents with no anxiety today").  On September 2, 2010, Plaintiff reported to her therapist that she was "happier" because she had begun dating a man who lives south of Columbus.  (Tr. 18, citing Tr. 803).

The ALJ also reviewed "normal mental status examination on numerous occasions throughout the record," including in March 2008 by Dr. Uzpen, and from September 2008 through December 2009 by Dr. Reddy.  Dr. Reddy indicated that Plaintiff's depression and anxiety were "controlled" with treatment, and noted Plaintiff's own report on November 12, 2008 that she was doing well on Celexa and that her mood was "stable."  (Tr. 18).  After reviewing that evidence, the ALJ turned to Dr. Alkhawaga's opinions, which he found were entitled to "little weight."

> Dr. Alkhawaga completed a mental capacities assessment on February 8, 2010, and he offered his opinion that the claimant experienced only moderate restrictions of daily activities and moderate deficiencies of concentration, persistence, or pace.  He opined that she was only slightly limited in social functioning, but he also opined that the claimant was likely to miss at least three days of work per month due to her impairments and/or treatment. … In a mental capacities assessment and narrative letter dated in January and March 2009, Jack Adkins, M.S. P.C.C., provided several limitations in work-related functional abilities and stated that the claimant's depression was "largely tied" to her physical condition.  According to Mr. Adkins, the claimant was unable to perform even part-time work (Exhibit 10F, pages 7-8). [Tr. 464].

> The undersigned gives little weight to these assessments under the criteria set forth in 20 CFR 404.1527 and SSR 96-2p because they are unsupported, and inconsistent with, objective findings in the record.  Dr. Alkhawaga's conclusion that the claimant would miss at least three days of work per month is inconsistent with his assessment that she experiences no more than moderate limitation in work-related functioning.  Such a conclusion is also inconsistent with the GAF score of 60 noted on the first page of the assessment, which indicates no more than moderate symptomatology (see DSM-IV, page 32).  Further, as discussed above, the TCN treatment notes show no more than a depressed mood, and Dr. Alkhawaga consistently reported only mild depression and anxiety and/or a euthymic mood.  These assessments are also inconsistent with Dr. Alkhawaga's statement in March 2009 that the claimant did not have "any" psychiatric limitations that would make her eligible for disability.

17

(Tr. 18).

Plaintiff asserts that "Dr. Alkhawaga's opinion is not inconsistent with the mental health treatment record," based on clinical records that reflect Plaintiff was "tearful" with a "depressed mood." (Doc. 8 at 15). However, Plaintiff does not explain why the ALJ's interpretation of the evidence constitutes reversible error, and the undersigned finds no such error exists. One can exhibit a tearful and depressed mood at mental health appointments without being wholly disabled from all work. The ALJ adequately explained why Dr. Alkhawaga's clinical records (reflecting relatively mild to moderate symptoms and a "stable" condition) were often inconsistent with the psychiatrist's extreme disability opinions, including but not limited to Dr. Alkhawaga's unequivocal statement in March 2009 that Plaintiff did not have "any" psychiatric limitations that would make her eligible for disability. (Tr. 586, see also Tr. 583, discussing Plaintiff's report to Mr. Adkins concerning her disappointment in Dr. Alkhawaga's position that any limitations would be physical, not psychological).

In her reply memorandum, Plaintiff for the first time criticizes the ALJ's assessment of Dr. Alkhawaga's opinion as an example of the ALJ "substitut[ing] her own lay opinion" or "playing doctor." Specifically, Plaintiff complains that Dr. Alkhawaga's opinion that Plaintiff had only "moderate" limitations in work-related areas was not necessarily inconsistent with the doctor's opinion that Plaintiff would likely miss three or more days of work per month. (Doc. 14 at 2). However, Dr. Alkhawaga consistently assessed Plaintiff's GAF scores in the "moderate" range, with a GAF score of 60 beginning on April 10, 2008, (Tr. 302) and continuing with "stable" symptoms all the way through to November 2010. The clinical records referenced by the ALJ and

18

reviewed by the undersigned constitute substantial evidence to support the ALJ's rejection of Dr. Alkhawaga's most limiting opinions.

### 2. The State Agency Reviewing Physicians

In addition to arguing that the ALJ erred in her assessment of treating physicians' opinions, Plaintiff argues that the ALJ erred by adopting the functional limitation opinions offered by state agency reviewing physicians. As Defendant is quick to point out, in appropriate circumstances, the opinion of even a non-examining state agency physician may be entitled to greater weight than the opinion of a treating or examining physician. *See generally* 20 C.F.R. §404.1527(e); SSR 96-5p, 1996 WL 374180; *see also Blakley*, *supra*.

Here, the ALJ assigned "great weight" to the opinions of a non-examining physician, Dr. Bolz, and to the opinions of an examining psychologist, Roy Shapiro, Ph.D. (Tr. 45-456, Tr. 396). The ALJ also relied in part on the supporting records from two treating pain physicians, Dr. Lichota and Dr. Domini, and opinion evidence from a second non-examining physician, Dr. Jerry McCloud, and a second non-examining psychologist, Joan Williams, Ph.D. (*See, e.g.*, Tr. 478, 470).

Most of the ALJ's RFC findings are derived from the opinions of Dr. Bolz, who completed a physical RFC assessment form on January 11, 2009. At that time Dr. Bolz opined that Plaintiff was capable of work consistent with the "light" exertional level, and that she could "stand and/or walk, as well as sit, no more than six hours in an eight-hour workday." Dr. Bolz further opined that Plaintiff could "never climb ladders, ropes, or scaffolds and could only occasionally kneel, crawl, or climb ramps or stairs." (Tr. 25). Last, Dr. Bolz opined that plaintiff could perform bilateral fingering no more than frequently. (Tr. 25). Dr. McCloud affirmed Dr. Bolz's assessment in June 2009.

Plaintiff primarily argues that the ALJ erred by giving greater weight to the opinions of the state agency physicians than to the opinions of Plaintiff's treating physicians, on the basis that the regulations envision the opposite weight to be given to opinion evidence.  However, the undersigned has previously determined that the ALJ provided "good reasons" for failing to give the various opinions of Plaintiff's treating physicians "controlling" weight here.  Therefore, the mere fact that the ALJ gave greater weight to consulting medical sources than to treating sources does not provide grounds for reversal.

Plaintiff alternatively argues that even if the ALJ was permitted to give great weight to the consulting opinions, the ALJ still committed reversible error by failing to include any restrictions on climbing.  Dr. Bolz specifically opined that Plaintiff would be limited to only "occasional" climbing of ramps or stairs and to "never" climbing ladders, ropes or scaffolds.   However, Plaintiff's RFC included no such restrictions.

Defendant fails to address this argument.  While the undersigned concludes that the ALJ clearly did err by failing to include climbing restrictions, it is equally clear that the error was harmless on the facts presented.  Ultimately, the ALJ concluded based upon vocational testimony that Plaintiff could perform her prior work of being a collections clerk and a secretary. Plaintiff testified that the collections work was performed on the telephone.  There is no evidence, and Plaintiff does not now argue, that either of her prior jobs would involve any climbing.

### III. Conclusion and Recommendation

For the reasons explained herein, **IT IS RECOMMENDED THAT** Defendant's decision be found to be **SUPPORTED BY SUBSTANTIAL EVIDENCE**, and **AFFIRMED**, and that this case be **CLOSED.**

_/s Stephanie K. Bowman_
Stephanie K. Bowman
United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

STARLENA WILKERSON,                                   Case No. 1:12-cv-868

      Plaintiff,                                           Spiegel, J.
                                                      Bowman, M.J.
   v.

COMMISSIONER OF SOCIAL SECURITY,

      Defendant.


**NOTICE**

Pursuant to Fed. R. Civ. P 72(b), any party may serve and file specific, written objections to this Report and Recommendation ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R. That period may be extended further by the Court on timely motion by either side for an extension of time. All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).